James P. Griffith (State Bar No. 110637)
jgriffith@hmglaw.com
HOWELL MOORE & GOUGH LLP
812 Presidio Avenue
Santa Barbara, CA 93101
Tel: (805) 962-0524
Fax: (805) 962-0534

Attorneys for Plaintiff
CARRIE C. HUTCHINSON

**UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARRIE C. HUTCHINSON, an individual,<br><br>    Plaintiff,<br><br>         vs.<br><br>JOSÉ I. RODRIDGUEZ, an individual; KENDALL/HUNT PUBLISHING COMPANY, an Iowa corporation; and DOES 1-10,<br><br>    Defendants. | CASE NO.   2:22-cv-03717<br><br>**COMPLAINT FOR:**<br><br>**(1) COPYRIGHT INFRINGEMENT (17 U.S.C. § 501 et seq.);**<br><br>**(2) CONTRIBUTTORY COPYRIGHT INFRINGEMENT; AND**<br><br>**(3) VICARIOUS COPYRIGHT INFRINGEMENT** |

**INTRODUCTION**

This action is filed under 17 U.S.C. § 501 et seq. by Plaintiff CARRIE C. HUTCHINSON to recover damages for infringement of her registered copyrights in two texts in the field of interpersonal communication, by Defendants JOSE I. RODRIGUEZ, KENDALL/HUNT PUBLISHING COMPANY and DOES 1-10, as well as to enjoin the publication and distribution of infringing works.

## PARTIES

1. Plaintiff CARRIE C. HUTCHINSON is an individual residing in Santa Barbara County, California. She is a tenured professor of communication at Santa Barbara City College in Santa Barbara, California, and an author of numerous copyrighted works in the communication field.

2. On information and belief, Defendant JOSE I. RODRIGUEZ ("Rodriguez") is an individual residing in Los Angeles County, California, and is a professor of communication at California State University at Long Beach in Long Beach, California.

3. On information and belief, Defendant KENDALL/HUNT PUBLISHING COMPANY ("KENDALL HUNT") is an Iowa corporation registered with the California Secretary of State, and having its principal place of business at 4050 Westmark Dr., Dubuque, IA 52002. It is a well-known publisher of college-level academic textbooks.

4. The true names and capacities of the Defendants named herein as DOES 1 through 10, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues said Defendants by said fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as DOE is legally responsible for the events and happenings hereinafter alleged and legally caused injury and damages proximately thereby to Plaintiff as alleged herein. Plaintiff will seek leave to amend the Complaint when the true names and capacities of said DOE defendants have been ascertained.

5. Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants participated in and is in some manner responsible for the acts described in these Counterclaims and any damages resulting therefrom.

6. Plaintiff is informed and believes, and on that basis alleges, that each of RODRIGUEZ, KENDALL HUNT, and DOES 1 through 10 was empowered to act as the agent, servant and/or employees of each other, and that all the acts

alleged to have been done by each of them were authorized, approved and/or ratified by each of them.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action under 17 U.S.C. § 501 et seq. and 28 U.S.C. §§ 1331, and 1338(a).

8. This Court has jurisdiction over Defendant RODRIGUEZ because, *inter alia*, he is a resident of this district, he has purposefully availed itself of the benefits and protections of the laws of the State of California by filing a complaint alleging state law claims against Plaintiff in this district, and he has voluntarily subjected himself to the Court's jurisdiction by filing a complaint against Plaintiff in this district.

9. This Court has jurisdiction over Defendant KENDALL HUNT because it has purposefully availed itself of the benefits and protections of the laws of the State of California by conducting business systematically and continuously in this district, including by entering into academic publishing contracts with RODRIGUEZ and other residents of this judicial district, and by, on information and belief, engaging in widespread sales of goods to, and solicitation of business with residents of this district.

10. Venue in this judicial district is proper in this District under 28 U.S.C § 1391(b) in that a substantial part of the events giving rise to the within claims occurred herein, and under U.S.C § 1400(a) in that it is a judicial district in which Defendants have committed acts of copyright infringement and had a regular and established place of business.

## FACTUAL ALLEGATIONS

11. Plaintiff is the sole author of a copyrighted work entitled *Two to Tango: Understanding and Applying Theories of Interpersonal Communication* (hereinafter "*TTT: Understanding*"). Hutchinson authored *TTT: Understanding* in 2008 under her maiden name "Carrie Cropley," and first published *TTT:*

*Understanding* on or about August 18, 2008. She registered her copyright in *TTT: Understanding* in her own name on or about July 1, 2010, obtaining the registration number TX0007416073. A copy of the *TTT: Understanding* copyright registration notice is attached hereto as Exhibit "A."

12. Plaintiff is also the sole author, as "Carrie Cropley Hutchinson," of a separate and independent copyrighted work entitled *Interpersonal Communication: Navigating Relationships in a Changing World* (hereinafter "*ICNR*"). Plaintiff created *ICNR* in 2010, and published it on August 2, 2010. She registered her copyright in ICNR on or about December 11, 2010, obtaining the registration number TX0007365987. A copy of the copyright registration notice for *ICNR* is attached hereto as Exhibit "B." *ICNR* is still in print, and is currently being sold to Plaintiff's students.

13. On or about October 21, 2009, Plaintiff entered into a contract with Gerald Baydo, an individual d/b/a "National Social Sciences Press" (hereinafter "NSSP"), for the publication of *TTT: Understanding*, defined in the contract as the "Work." A copy of the publishing contract entered into by Plaintiff and NSSP (the "NSSP Contract") is attached as Exhibit "C."

14. Section 1.3 of the NSSP Contract provided in relevant part that "[t]he copyright in the Work shall remain the property of the Author," and that "the Publisher shall ensure that all versions of the Work published by the Publisher shall . . . carry in the preliminary pages of the Work the copyright symbol together with the name of the Author (or as the Author directs) and year of first publication of the Work."

15. In 2009, NSSP published and sold *TTT: Understanding* in paperback and digital format, with "Carrie J. Cropley" listed as author. Both the paperback and digital versions of *TTT: Understanding* had an orange cover. In violation of Section 1.3 of the NSSP Contract, the copyright notice for *TTT: Understanding* listed NSSP after the copyright symbol instead of Plaintiff.

16. Section 9 of the NSSP Contract provided as follows:

> Author agrees to edit and revise every subsequent edition of the Work if and when requested in writing by the Publisher to do so and from time to time to supply any new matter that may be necessary to keep the Work up to date. Such revisions or changes shall be considered as part of the original Work.
>
> If the Author is unwilling, unable or for any reason fails to carry out the required revisions, the Publisher may arrange for a competent third party to do so after consultation with the Author and any fees or royalties payable to such third party shall be deducted from monies due to the Author. The Publisher shall be entitled to continue to use the name of the Author in respect of the revised Work with reference as appropriate to any such third party.

17. Due to his poor performance in publishing *TTT: Understanding* (including misattribution of the copyright, as noted above), Plaintiff told NSSP's principal Gerald Baydo in or around 2010 that she was unwilling to participate in updating *TTT: Understanding*. Paragraphs 18 to 31 below, describing events occurring after this notification, are alleged on information and belief:

18. Pursuant to Section 9 of the Contract, NSSP reached out to RODRIGUEZ—whose communication classes at Long Beach State, comprising hundreds of students, used *TTT: Understanding* as their assigned reading—and asked him to participate in updating *TTT: Understanding*. In return, NSSP agreed to list RODRIGUEZ as primary author of the updated work and to pay him a 25% royalty on sales, i.e., the vast majority of the 33% royalty share that Plaintiff was entitled to receive under the NSSP Contact.

19. When it hired RODRIGUEZ to update *TTT: Understanding* in or about 2011, NSSP gave RODRIGUEZ a CD of *TTT: Understanding*, and possibly the paperback as well, providing RODRIGUEZ with "access" thereto.

20. NSSP's update to *TTT: Understanding* was published in or around 2011-2012, and was retitled *Two to Tango: Interpersonal Communication in*

*Everyday Living* (hereinafter "*TTT: Interpersonal*"). Unlike *TTT: Understanding*, which had an orange cover, *TTT: Interpersonal* had a purple cover, on both the paperback and CD versions.

21. The content of *TTT: Interpersonal* was substantially identical to that of *TTT: Understanding*. The only substantive difference was that *TTT: Interpersonal* added two new chapters to the ten chapters that had comprised *TTT: Understanding*. In other words, *TTT: Interpersonal* was a derivative work of *TTT: Understanding* that had a total of twelve chapters: (a) the ten chapters that had formed *TTT: Understanding*, which were carried over verbatim to *TTT: Interpersonal*, plus (b) two new chapters contributed by RODRIGUEZ.

22. Defendant was initially listed as sole author of *TTT: Interpersonal*, in violation of Plaintiff's authorship attribution rights under the NSSP Contract. NSSP later changed the authorship attribution to "by Jose I. Rodriguez with Cynthia B. Johnson." Ms. Johnson was an instructor at a different college who had also used *TTT: Understanding* in her classes. NSSP listed her as a contributing author at her request, in return for certain assistance she provided during the revision process.

23. In or around 2011, Plaintiff and NSSP became embroiled in a dispute over NSSP's failure to pay or properly account for royalties on *TTT: Understanding*, as well as over its failure to provide appropriate authorship and copyright attribution in connection with *TTT: Interpersonal*. The dispute ultimately ended in an agreement in which, *inter alia*, (a) NSSP acknowledged that Plaintiff owned the copyright to *TTT: Interpersonal* and agreed to list her as such in the future, and (b) in return for monthly royalty payments to be made by NSSP, Plaintiff licensed to NSSP her copyright in *TTT: Understanding* in order to allow NSSP to continue to distribute *TTT: Interpersonal* up until the end of the spring 2014 academic term, at which point NSSP's copyright license in *TTT: Understanding* terminated automatically.

24. Additionally, in order to correct its failure to list Plaintiff as an author of *TTT: Interpersonal*, NSSP once again changed the authorship attribution, this time to "by Jose I. Rodriguez with Carrie Cropley Hutchinson." A photocopy of the CD covers for *TTT: Understanding* and *TTT: Interpersonal* (Rodriguez/Hutchinson version) is attached as Exhibit "D."

25. The scheduled spring 2014 termination of NSSP's copyright license in *TTT: Understanding*—that license being the only thing that allowed NSSP to distribute and sell its derivative work, *TTT: Interpersonal*—put RODRIGUEZ in a bind: He was using *TTT: Interpersonal* in his classes, and earning substantial royalties on it, but after the spring 2014 term he would no longer be able to assign it to his students, even though he was listed as primary author. He did not want to lose the royalty stream, nor did he want to disclose to his colleagues and students that he had not actually written the vast majority of "his" textbook. But at the same time, independently creating a full-length introductory college-level text on any subject is a major, time-intensive undertaking. RODRIGUEZ thus looked for a shortcut to solve his dilemma.

26. His solution was to create a purportedly new and original text, to which he would claim sole authorship and exclusive copyright, by <u>copying</u> *TTT: Interpersonal*—verbatim as to his two chapters, and as to Plaintiff's ten copyright-protected chapters, by making superficial changes or additions to the wording and sentence structure, while leaving the overall content, organization, tone and flow of Plaintiff's text intact. This would be far less intellectually demanding and time-consuming for RODRIGUEZ than actually creating his own original work, while also ensuring that he would be familiar with the text when it came time to teach from it, and that he would not need to redesign his class curricula around a genuinely new text from a different author.

27. RODRIGUEZ completed his "copying by paraphrasing" project in time for the fall 2014 school term, i.e., in the summer of 2014. He retitled his new

and "original" work *Interpersonal Communication for Contemporary Living*, ("*ICCL*") and published it on August 1, 2014. He obtained a federal copyright registration for ICCL on February 9, 2015. (A copy of the copyright registration notice for *ICCL* is attached as Exhibit "E.")

28. RODRIGUEZ registered *ICCL* with the Copyright Office in his name as sole and original author (i.e., he did not register *ICCL* as a derivative work of *TTT: Understanding*, which in fact it was). RODRIGUEZ thereupon entered into a publishing contract with KENDALL HUNT for *ICCL*, under which KENDALL HUNT was assigned the exclusive rights to, *inter alia*, reproduce, distribute, and prepare derivative works of *ICCL*.

29. Like TTT: *Interpersonal*, *ICCL* has 12 chapters. Although they have been rearranged, and in some cases retitled, the 12 chapters comprising *ICCL* are identical in substance to the 12 chapters of *TTT: Interpersonal*.

30. While the two chapters in TTT: *Interpersonal* that were contributed by RODRIGUEZ were reproduced verbatim in *ICCL* (there being no danger that RODRIGUEZ would sue himself for infringement), the ten chapters that derived from *TTT: Understanding* (i.e., the ones that Plaintiff created) were superficially rewritten, in a transparent but unsuccessful attempt to disguise their origin.

31. That the vast majority of *ICCL* was wrongfully copied from *TTT: Understanding* (and its derivative work *TTT: Interpersonal*) becomes overwhelmingly clear when the two works are compared side by side in their entirety—sentence by sentence, paragraph by paragraph and chapter by chapter.

32. Initially, one of the most striking aspects of the similarity between the two works consists of the "Learning Objectives" and "Chapter Outline" that are provided together at the beginning of each chapter in both works.

33. For example, reproduced below from the paperback volume of *TTT: Understanding* are the "Learning Objectives" and "Chapter Outline" for Chapter 1, entitled *What Is Interpersonal Communication and How Do We Study It?*:

COMPLAINT
- 8 –

# Chapter 1
# What Is Interpersonal Communication and How Do We Study It?

## Learning Objectives:

After studying this chapter, students should be able to:

1. Describe the areas of study in the field of communication.
2. Define interpersonal communication and compare and contrast it with impersonal communication.
3. Explain the characteristics and principles of interpersonal communication.
4. Explain the components and models we use to describe the process of interpersonal communication.
5. Describe different methods through which social science research is conducted.
6. Explain why it is useful to study interpersonal communication.
7. Understand what is meant by communication competence and assess where they are in this process.
8. Create realistic expectations for what can be achieved by taking a course in interpersonal communication.

## Chapter Outline:

Chapter Introduction
What Does It Mean To Study "Communication"?
    Defining Communication
    Areas of Study in the Field of Communication
What Is Interpersonal Communication?
    Distinguishing Interpersonal from Impersonal Communication
    Characteristics of an Interpersonal Relationship
        Interdependence
        Relational Maintenance
        Rules of Behavior
Principles of Interpersonal Communication
    Interpersonal Communication is Inescapable
    Interpersonal Communication is Irreversible
    Interpersonal Communication is Unrepeatable
How Do Communication Scholars Research/Study Interpersonal Communication?
    Components of the Interpersonal Process
    Models for Understanding Interpersonal Communication
    What Methods are used to Study How People Communicate?
    How Do Communication Scholars Make Conclusions?
Why Is It Important To Learn About Interpersonal Communication?
    Interpersonal Communication Helps Us Meet Fundamental Human Needs
    Understanding Interpersonal Communication Can Improve Physical and Emotional Health
    Learning About Interpersonal Communication Can Help Us Understand and Improve Family Dynamics
    Understanding Interpersonal Communication Can Improve Romantic Relationships
    Understanding Interpersonal Communication Can Improve Relationships with Colleagues
    Learning About Interpersonal Communication Can Help Create Rewarding Friendships
How Can You Improve Your Own Interpersonal Communication?
    How Much Can You Control?
    How Does One Achieve Communication Competence?
    A Model of the Process of Communication Competence
    What Should I Expect?
Chapter Summary

34. Here are the "Learning Objectives" and "Chapter Outline" for Chapter 1 of *ICCL*, which is entitled *Interpersonal Communication: The Basics:*

# Chapter 1

# Interpersonal Communication: The Basics

## Learning Objectives

1. Define interpersonal and impersonal communication.
2. Describe communication as a field of study.
3. Understand the characteristics and principles of interpersonal communication.
4. Explain the components and models of interpersonal communication.
5. Discuss the methods for studying interpersonal communication.
6. Explain why we study interpersonal communication.
7. Understand the concept of communication competence.
8. Cultivate realistic expectations as a competent communicator in relationships.

## Chapter Outline

Chapter Introduction
Communication: A Working Definition
   Communication: An Area of Study
Interpersonal and Impersonal Communication: The Differences
Characteristics of Interpersonal Relationships
   Interdependence
   Maintenance
   Rules
Interpersonal Communication Principles
   Inescapable
   Irreversible
   Unrepeatable
Learning About Interpersonal Communication
   Helping Us Meet Primary Human Needs
   Improving Physical and Emotional Health
   Helping Us Understand and Improve Family Dynamics
   Improving Romantic Relationships
   Improving Relationships at Work
   Cultivating Rewarding Friendships
Interpersonal Communication as a Process
   Interpersonal Communication Models
Methods for Studying Communication
   Arriving at Conclusions: Using Communication Research
Improving Interpersonal Communication
   Control: What Can You Expect?
   Communication Competence
   Communication Competence: A Model
   Realistic Expectations About Competence
Chapter Summary

3

COMPLAINT
– 10 –

35. Similarly, below are the "Learning Objectives" and "Chapter Outline" for Chapter 2 of *TTT: Understanding*, entitled *Verbal Communication*:

**Chapter 2**
**Verbal Communication**

**Learning Objectives:**

After studying this chapter, students should be able to:

1. Explain the arbitrary nature of words.
2. Explain why words are powerful.
3. Explain why words are inherently unclear and why shared meaning is so difficult to achieve through verbal communication.
4. Explain how we use words to communicate identity.
5. Describe the contexts that affect the meanings of words, including time, culture, and gender.

**Chapter Outline:**

Chapter Introduction
Words are Arbitrary Symbols
    The Triangle of Meaning
Words are Powerful
    Sapir-Whorf Hypothesis
Words Carry Content and Relational Meaning
Words Have Rules
    Rules for Beginning and Ending Conversations
      Rules for Maintaining Conversations
        The Principle of Turn-taking
        The Principle of Dialogue
           The Principle of Cooperation
Words Range in Clarity
    Vague Language
    Language Mistakes
    Multiple Meanings
    Careful Language
Words Communicate Identity
    Jargon
    Slang
Words are Contextual
    Historical Context of Language
      Gender and Language
        Masculine Speech
          Feminine Speech
      Cultural Context and Language
        High Context Communication
          Low Context Communication
Chapter Summary

27

36. Here are the "Learning Objectives" and "Chapter Outline" for Chapter 6 of *ICCL*, which is entitled *Communicating Verbally: Words in Context*:

# Chapter 6
# Communicating Verbally: Words in Context

## Learning Objectives

1. Describe the subjective and symbolic features of words.
2. Understand how words can be powerful communication tools.
3. Explain why misunderstandings are common and the challenges of co-creating meaning effectively.
4. Discuss how individuals communicate identity through verbal messages.
5. Examine how the process of creating meaning is contextual or situational.

## Chapter Outline

Chapter Introduction
The Subjective and Symbolic Nature
   of Words
  Understanding the Triangle of Meaning
The Power of Words
  The Sapir-Whorf Hypothesis
The Content and Relational Meaning
   of Words
Rule-governed Properties of Words
  Beginning and Ending Conversations:
     Some Common Rules
  Maintaining Conversations
    The Principle of Turn-taking
    The Principle of Dialogue
    The Principle of Cooperation

The Clarity of Words
  Using Vague Language
  Using Language Incorrectly
  Creating Meaning in Numerous Ways
  Using Language Cautiously
Communicating Identity by Using Words
  The Use of Jargon
  The Use of Slang
The Contextual Features of Words
  The Context of History
  Understanding Language and Gender
    Features of Masculine Speech
    Features of Feminine Speech
  Understanding Language and Culture
Chapter Summary

95

37. However, the organization and the section and topic headings are not the only things that RODRIGUEZ misappropriated from *TTT: Understanding* when he created *ICCL*. He copied the text of *TTT: Understanding* as well. While space limitations prohibit setting out in full all of the close similarities in expression between *TTT: Understanding* and *ICCL*, representative examples from each of the ten chapters in *TTT: Understanding* are provided in Exhibit "F."

38. Equally powerful evidence of deliberate copying is contained in the footnotes to the two works. *ICCL* copies dozens of footnotes verbatim from *TTT: Understanding*, and a substantial number of these footnotes contain *identical typos and minor inaccuracies*. This would be impossible if *ICCL* were truly RODRIGUEZ's original work, and he had created his own footnotes.

39. In or about August of 2019, RODRIGUEZ registered a second edition of *ICCL* with the Copyright Office, identifying it as a derivative work of the first edition of *ICCL*. As with the first edition, KENDALL HUNT owns the exclusive rights of reproduction, distribution, and derivative work creation in connection with the second edition of *ICCL*. (The text used in the side-by-side comparisons shown in Exhibit "F" was taken from the first edition of *ICCL*.)

40. Plaintiff first learned of the existence of *ICCL* in or about December of 2020, when she received an e-mail from a KENDALL HUNT sales representative inquiring whether she might want to use the second edition of *ICCL* in her classes. Plaintiff recognized RODRIGUEZ's name from her dispute with NSSP in 2012, whereupon she obtained a copy of *ICCL* and determined that ten of its 12 chapters were thinly-disguised reworkings of the ten chapters of *TTT: Understanding*, as described above.

41. Upon realizing that *ICCL* amounted to a devious theft of her protected intellectual property, Plaintiff retained counsel to contact KENDALL HUNT and notify it that *ICCL* violated her copyrights in *TTT: Understanding* and *ICNR*. Plaintiff's counsel (a) advised KENDALL HUNT's counsel that

RODRIGUEZ obtained access to *TTT: Understanding* when he contracted with NSSP as "author for hire" for that work in around 2011, (b) provided KENDALL HUNT's counsel with Plaintiff's copyright registration for *TTT: Understanding*, and (c) further provided him with multiple examples of *ICCL*'s "substantial similarity" to Plaintiff's copyrighted expression in *TTT: Understanding*.

42. Throughout 2021 and early 2022, counsel for Plaintiff engaged in discussions with counsel for KENDALL HUNT and counsel for RODRIGUEZ in an attempt to redress her rights as copyright owner under the Copyright Act, but no resolution was reached, necessitating the filing of this Complaint.

43. On information and belief, despite being informed of Plaintiff's claims and the overwhelming evidence of copying, Defendants have continued to publish, reproduce, market and sell the second edition of *ICCL*.

44. On or about January 31, 2022, RODRIGUEZ filed in this Court a complaint against Plaintiff for declaratory relief and damages that sought, *inter alia*, a declaratory judgment of non-infringement with respect to *ICCL*. (*Rodriguez v. Hutchinson*, Case No. 2:22-cv-00683-SK.) The complaint alleged that as a result of Plaintiff's purportedly false allegations that *ICCL* infringed on *TTT: Understanding*, KENDALL HUNT had ceased making royalty payments to RODRIGUEZ under their publishing contract. Notably, the complaint did ***not*** allege that *ICCL* was RODRIGUEZ's original work. Nor did the complaint deny (i) that RODRIGUEZ had access to *TTT: Understanding* when he created *ICCL*, (ii) that *ICCL* was and is substantially similar to *TTT: Understanding*, or (iii) that RODRIGUEZ copied from *TTT: Understanding* when he created *ICCL*. A copy of RODRIGUEZ's complaint is attached as Exhibit "F."

45. Plaintiff did not withdraw her allegations of infringement in response to RODRIGUEZ's complaint.

46. On or about March 28, 2022, before Plaintiff filed an answer or counterclaims, RODRIGUEZ dismissed his complaint.

# FIRST CLAIM FOR RELIEF

## (Copyright Infringement Against All Defendants)

47. Plaintiff realleges and incorporates by reference each and every allegation in Paragraphs 1 through 46 hereof, as if fully set forth herein.

48. At all times relevant, Plaintiff has owned valid, independent registered copyrights in *TTT: Understanding* and in *ICNR* (said copyrights are hereinafter referred to as the "Registered Copyrights").

49. The brazen and calculated nature of the "copying by paraphrasing" scheme carried out by RODRIGUEZ is described perfectly by the court's opinion in *Consol. Music Pub., Inc. v. Hansen Publications*, 339 F. Supp. 1161, 1165 (S.D.N.Y. 1972):

> The minor changes, additions and paraphrases expose rather than conceal the plagiarism; they emphasize the deliberateness of the copier's action. The instances of similarity of language are so numerous that defendant's claim they are merely the incidental use of common descriptive terms of instruction challenges common experience.

50. Defendants' conduct as alleged herein, including but not limited to their publication, reproduction and sale of the first and second editions of *ICCL*, constitutes willful infringement of the Registered Copyrights.

51. As a result of Defendants' willful infringement of the Registered Copyrights as alleged herein, Plaintiff has been damaged in amount to be determined at trial.

52. As a result of Defendants' willful infringement of the Registered Copyrights as alleged herein, Plaintiff is entitled to recover Defendants' profits to the extent they are not included as part of Plaintiff's damages.

53. In the alternative, at the election of Plaintiff, Plaintiff is entitled to recover from Defendants statutory damages of up to $150,000.00 for each of the two Registered Copyrights that Defendants have willfully infringed as a result of their wrongful conduct, pursuant to 17 U.S.C. § 504(c)(2).

54. As a result of Defendants' willful infringement of the Registered Copyrights as alleged herein, Plaintiff is further entitled to recover her costs and attorneys' fees, pursuant to 17 U.S.C. § 505.

## SECOND CLAIM FOR RELIEF

**(Contributory Copyright Infringement Against All Defendants)**

55. Plaintiff realleges and incorporates by reference each and every allegation in Paragraphs 1 through 54 hereof, as if fully set forth herein.

56. Prior to the filing of this Complaint, Defendants, and each of them, knew that the publication and distribution of *ICCL* constituted direct infringement of the Registered Copyrights.

57. Prior to the filing of this Complaint, Defendants induced, caused, or materially contributed to the acts comprising direct infringement of the Registered Copyrights, entitling Plaintiff to the same relief against Defendants sought in the First Claim for Relief.

## THIRD CLAIM FOR RELIEF

**(Vicarious Copyright Infringement Against All Defendants)**

58. Plaintiff realleges and incorporates by reference each and every allegation in Paragraphs 1 through 54 hereof, as if fully set forth herein.

59. Prior to the filing of this Complaint, Defendants, and each of them, had the right and ability to control or supervise the infringing activity of the Defendants whose actions infringed on the Registered Copyrights.

60. Prior to the filing of this Complaint, Defendants had a direct financial interest in the infringing activity of the Defendants whose actions infringed on the Registered Copyrights, entitling Plaintiff to the same relief Against Defendants sought in the First Claim for Relief.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court make findings and issue orders and judgment as follows:

1. That Plaintiff owned, at all times relevant, valid, registered copyrights in the academic literary works *Two to Tango: Understanding and Applying Theories of Interpersonal Communication*, registration number TX0007416073, and *Interpersonal Communication: Navigating Relationships in a Changing World,* registration number TX0007365987 ("Registered Copyrights");

2. That in copyrighting, reproducing, publishing, marketing and selling the first and second editions of *Interpersonal Communication for Contemporary Living* ("*ICCL*"), Defendants have willfully infringed on the Registered Copyrights and continue to do so;

3. That Defendants are enjoined from committing any acts that infringe on Plaintiff's Registered Copyrights, including but not limited to the publication, distribution or sale of *ICCL*, pursuant to 17 U.S.C. § 502;

4. That Defendants are liable to Plaintiff for her actual damages suffered on account of their willful infringement of the Registered Copyrights, or in the alternative, for enhanced statutory damages of $150,000 for each act of infringement;

5. That Plaintiff is awarded her costs and reasonable attorneys' fees incurred in connection with this action; and

6. That the Court grant Plaintiff such other and further relief as the Court deems proper.

Dated: June __1__, 2022          HOWELL MOORE & GOUGH LLP

_____/ s / James P. Griffith_____
By:   James P. Griffith
      Attorneys for Plaintiff CARRIE C. HUTCHINSON